UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

PATRICIA STORM, as the wife in
the marital community and as
Personal Representative for
the Estate of John Storm, who
was husband in the marital
community,

           Plaintiff,

      v.

CITY OF PASCO, a municipal
corporation, et al.,

        Defendants.

NO. CV-10-5093-EFS

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT,
DISMISSING CASE, AND CLOSING
FILE**

     This matter comes before the Court on Defendants' Motion for Summary Judgment, ECF No. 40, and Plaintiff Patricia Storm's Cross Motion for Partial Summary Judgment on Probable Cause, ECF No. 55. A hearing on the parties' motions was held on July 17, 2012, in Richland. After reviewing the record in this matter and relevant authority, and hearing from counsel, the Court was fully informed. This Order serves to memorialize and supplement the Court's oral rulings denying Plaintiff's motion, granting Defendants' motion, and dismissing this matter.

///

//

/

ORDER - 1

## I.   Background[1]

### A.   Troy Fuller

The story behind this lawsuit involves parents' love and generosity, a son's illness, and the criminal endeavors of a man who is not a party: Troy Fuller.  In August 2009, Fuller embarked on a crime spree in the Tri-Cities area that rapidly escalated from its humble beginning in petty forgery to a dramatic conclusion involving a homemade explosive device and a dramatic SWAT team raid.

On August 15, 2009, Fuller passed a forged check at the Fiesta Foods grocery store in Pasco, Washington.  A witness to the incident identified Fuller as the culprit and provided officers with the description of the vehicle Fuller had used to flee the store, a white Ford pickup truck with Washington license plate number B16238L.  Just three days later, on August 18, 2009, Fuller entered the Kennewick, Washington branch of Bank

---

[1]   When considering this motion and creating this Background section, the Court does not weigh the evidence or assess credibility. Instead, the Court takes as true all undisputed facts, and views all evidence and draws all justifiable inferences therefrom in favor of the party opposing each motion.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  However, the Court did not accept as true assertions made by the opposing party if they were flatly contradicted by the record.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  Disputed facts and quotations are set forth with citation to the record, while undisputed facts are not.

of the West and handed the clerk a deposit slip with the word "robbery" written on it, escaping the scene with eight hundred dollars. Later that same day, Fuller overdosed on heroin at the Richland, Washington home of brothers Donald and Steven Semmern. A Richland police officer and a Richland emergency services ambulance responded to the call, but it is unclear whether Fuller was hospitalized or arrested. On August 21, 2009, Fuller robbed the Kennewick branch of U.S. Bank, this time making off with one thousand dollars.

On the morning of August 25, 2009, Fuller entered a Rite Aid drugstore in Richland with a four-inch plastic device strapped to his stomach and a black remote control in his hand. Fuller told the store manager that he was carrying a bomb and demanded money. The manager complied and gave Fuller seven hundred and ninety dollars, which Fuller placed into a small duffle bag with a Seattle Mariners logo. Richland Police Officer Christopher Lee responded to the scene and attempted to pursue Fuller on foot, but Fuller was nowhere to be found; based on the speed with which Fuller disappeared, Officer Lee concluded that he had fled using a vehicle located within a short distance from the store. A store employee identified Fuller as the culprit from a photo montage, and a cell phone "ping" placed Fuller in the area surrounding the Rite Aid roughly one half-hour prior to the robbery.

In an effort to find Fuller, Officer Lee and Richland Police Officer Jarin Whitby went to the Tahitian Inn in Pasco, an inexpensive motel where Fuller was known to stay, but the clerk indicated that Fuller was not a guest at the inn. Officers Lee and Whitby also checked other motels and homes that Fuller was known to frequent, but to no avail.

ORDER - 3

Officer Whitby and Richland Police Officer Jeffrey Bickford then went to the Semmerns' residence, where Fuller had overdosed one week earlier, to determine whether the Semmerns had any information regarding Fuller's whereabouts. Officer Whitby eventually spoke to Steven Semmern on the telephone, who informed him that he had "recently" picked up Fuller from a female's apartment on Sylvester Street in Pasco. Semmern identified the woman as "Stacy," stated that the apartment number was A-3, and described the area and the apartment building. Officer Whitby relayed this information to Officer Lee, who entered the information into the "ILEADS" computer database, which showed that a woman named Stacy Lane lived in Apartment A-3 at 2313 West Sylvester Street in Pasco. The ILEADS report also showed that Ms. Lane was a suspect with Troy Fuller and Andy Torres in the Pasco Fiesta Foods forgery one week earlier; Mr. Torres was the registered owner of the white pickup truck that had been used to leave the scene.

**B.    Apartment A-3**

Plaintiff Patricia Storm and her now-deceased husband John Storm purchased apartment A-3 at 2313 W. Sylvester St. (hereinafter "the Apartment") in 1990. The Storms never resided in the Apartment, but generously permitted their adult son Jerry Storm to live there from 1990 to 2009. In August 2009, Jerry Storm was living in the Apartment with Ms. Lane, who was his girlfriend. Mr. Storm and Ms. Lane were not neat housekeepers, and damaged the Condominium in various ways including staining the walls with cigarette smoke, removing the baseboard and part of the floor, allowing mold to grow in the bathroom, and nailing the kitchen cabinets shut.

For a period during the month of August 2009, Mr. Storm permitted Mr. Torres to stay in the Apartment's guest bedroom.  At some point several days before August 25, 2009, Mr. Torres invited Troy Fuller to the Apartment, where Fuller stayed overnight.  Ms. Lane told Mr. Storm that she did not want Fuller to stay at the Apartment, so Mr. Storm brought Fuller to the Tahitian Inn and booked him a room in Mr. Storm's name.  The Tahitian Inn is located at 2724 West Lewis Street in Pasco, roughly six city blocks from the Apartment.

**C.    SWAT Team Raid**

Meanwhile, based on the ILEADS information communicated to them, Pasco Police Department patrol officers went to the building where the Apartment was located and observed a white Ford pickup truck parked outside.  The pickup truck bore Washington license plate B16238L, the same plate that had been observed on the white pickup truck connected with the Fiesta Foods forgery.  The officers surrounded the home and detected signs that someone was inside: two officers noticed someone move a curtain and look out a window, and from the back of the Apartment, Pasco police officer Michael Nelson noticed the curtain behind the glass sliding door move suddenly, as if someone had been surreptitiously observing the assembling officers.  This information, as well as information about the pickup truck, was conveyed to Officer Lee, who drove to the scene after notifying Tri-City Regional SWAT Team member Wayne Dubois that the team might be needed in Pasco that evening. Officer Lee also called the Kennewick Police Department and asked them to respond to the Apartment.

/

ORDER - 5

When Officer Lee arrived at the scene, Kennewick Police detective Mike Hamilton and Sergeant Jack Simington informed him that they had received cell phone "pings" from Troy Fuller's cell phone in the vicinity of 28th Avenue and Sylvester Street in Pasco, roughly four blocks from the Apartment.  Officers went to that intersection, but found no trace of Fuller.

At roughly 6:45 p.m., officers used a public address system to demand that any occupants of the Apartment exit the home.  Several minutes later, Andy Torres exited the Apartment and was arrested on an unrelated warrant.  Mr. Torres told the officers that he was the only person in the apartment, but also denied that he had moved the curtain.

At 6:49 p.m., Officer Lee called Franklin County Superior Court Judge Craig Matheson to request a search warrant for the Apartment. During that conversation, Judge Matheson put Officer Lee under oath and Officer Lee briefly described his professional experience and the circumstances surrounding Fuller's recent crimes.  Officer Lee then discussed how the white pickup truck associated with the Fiesta Foods forgery was parked outside the Apartment, and how Steven Semmern had told Officer Whitby that "apartment A3 was the residence where he had picked up Fuller in the past." Lee Aff., ECF No. 44-1 at 3.  Finally, Officer Lee discussed Torres' exit from the residence and his claim that no one else was present inside.  Officer Lee asked for permission to search the Apartment to look for the specific denominations of currency stolen from the banks and the Rite Aid, the Seattle Mariners duffle bag, specified articles of clothing, and the putative explosive device and remote control Fuller brandished during the Rite Aid robbery.  Judge Matheson

ORDER - 6

telephonically authorized the search warrant, stating that he was relying upon Officer Lee's telephonic affidavit as well as other affidavits relating to Fuller that he had received in the previous days.

Mr. Storm and Ms. Lane returned home during this time period but, seeing the officers assembling outside the Apartment, detoured to the home of Ms. Lane's mother. Ms. Lane called the Pasco Police Department to learn why the police were outside of her home, and at 7:24 p.m., she was connected with Pasco Police Officer Bradford Gregory, who was present at the scene.[2] Officer Gregory was familiar with Ms. Lane from prior criminal activity, but told her that he was only interested in apprehending Troy Fuller. Ms. Lane first stated that no one was at the Apartment, but when confronted with the fact that Mr. Torres had already exited the Apartment, conceded that "her friend Andy" was there. Gregory Decl., ECF No. 46 ¶ 11.

At 7:15 p.m., members of the Tri-City Regional SWAT Team arrived outside the Apartment and replaced the Pasco officers who had previously surrounded the home. At 8:30 p.m., the SWAT team evacuated neighboring apartments for the safety of the neighbors. At 8:40 p.m., the SWAT

---

[2] Officer Lee states that Officer Gregory's conversation with Ms. Lane "likely occurred . . . before my conversation with Judge Matheson," but states that he was not aware the conversation had occurred at the time he spoke with Judge Matheson. Lee Decl., ECF No. 44 ¶ 37. Officer Gregory, however, states that he spoke with Ms. Lane at 7:24 p.m., some time after Officer Lee's 6:49-to-6:58 p.m. call to Judge Matheson. Gregory Decl., ECF No. 46 ¶ 7; see also Lee Aff., ECF No. 44-1 at 1, 4.

ORDER - 7

team's trained hostage negotiator used a public address system to urge the Apartment's occupants to exit the Apartment peacefully.    At 8:58 p.m., the SWAT team deployed two "flashbangs"[3] on the front and back side of the Apartment.    At 8:59 p.m., the SWAT team broke two windows on the Apartment's upper level and launched tear gas and pepper spray canisters into the Apartment.    At 9:00 p.m., officers made another public address announcement.    At 9:30 p.m., the rear sliding door to the apartment was shot and tear gas and pepper spray canisters were launched into the Apartment.

At 10:04 p.m., SWAT team members entered the Apartment and moved from room to room.    Because they were searching for a man they believed to possess an explosive device, the SWAT team members detonated a "Stinger"[4] grenade in each room before they entered it.    Finding no one on the first floor, the SWAT team proceeded upstairs, again detonating a Stinger before breaching each room.    The last room the SWAT team reached was a locked bedroom, which team members kicked open.    Fuller was nowhere to be found.

The officers then proceeded to Ms. Lane's mother's home to discuss the incident with Mr. Storm and Ms. Lane.    Mrs. Storm argues that the

---

[3] A "flashbang" is an explosive device that creates a bright flash of light and loud noise designed to disorient and intimidate its subject.

[4] A "Stinger" is another form of non-lethal explosive device that releases a fusillade of small rubber pellets along with a bright flash of light and a loud noise.    Some "Stinger" models also include chemical agents such as tear gas or pepper spray.

ORDER - 8

officers searched Mr. Lane's mother's home without authority, but does not elaborate on the point and appears to acknowledge that she would not have standing to bring a claim based on that search.

**D.   Aftermath and Legal Action**

The damage to the Apartment as a result of the police raid was considerable.  Numerous windows were broken, the noxious smell of pepper spray and tear gas lingered throughout the home, and the Apartment's floors, ceilings, walls, and fixtures were damaged by the SWAT team's Stinger grenades.  Mrs. Storm hired Northwest Restoration, Inc. to repair the Apartment, ultimately spending over $50,000.00.  Because of the damage Mr. Storm and Ms. Lane had previously caused to the Apartment, however, Defendants dispute that the entirety of these repairs were necessitated by the SWAT team's August 25, 2009 entry.

Mrs. Storm and her late husband filed claim forms with the Cities of Pasco and Richland and with Benton County pursuant to RCW 4.96.020. Those claims were presumably denied, and the Storms filed a Complaint for Damages in Benton County Superior Court on June 23, 2010.  ECF No. 1. Defendants removed the lawsuit to this Court on August 6, 2010, *id.*, and on August 9, 2011, Mrs. Storm filed an Amended Complaint on behalf of herself and as Personal Representative for the Estate of John Storm, who had since passed away.  ECF No. 24.  The Amended Complaint names as Defendants the City of Pasco, the City of Richland, and Benton County, (hereinafter "Municipal Defendants"), as well as a number of named and unnamed officers from the Richland and Pasco Police Departments and the Tri-City Regional SWAT Team (hereinafter "Individual Defendants").  On April 2, 2012, Defendants filed the instant Motion for Summary Judgment,

and on April 23, 2012, Mrs. Storm filed the instant Cross Motion for Partial Summary Judgment on Probable Cause in riposte.

## II.  Discussion

### A.  Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322.  "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts.  In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted) (emphasis in original).

When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.  This does not mean that the Court accepts as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott,* 550 U.S. at 380.

ORDER - 10

**B.    Analysis**

Mrs. Storm's Amended Complaint asserts claims for violation of her federal and state constitutional "rights to privacy," as well as state law claims for outrage, conversion, "strict liability," negligence, wrongful injury to property pursuant to RCW 4.24.630, and trespass.  On April 6, 2012, Mrs. Storm filed a Notice of To Be Adjudicated Claims in which she states that she abandons all claims except her constitutional, wrongful injury to property, negligence, and trespass claims.  ECF No. 51.

**i.    § 1983 Claim**

Mrs. Storm asserts a claim for violation of her Fourth Amendment rights to be free from unreasonable searches and from excessive force under 42 U.S.C. § 1983.  Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the Unietd States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.  Because Mrs. Storm's § 1983 claim raises different issues with regard to the Municipal Defendants and the Individual Defendants, the Court analyzes those classes of Defendants separately.

**a.    Municipal Defendants**

As it relates to the City of Richland, the City of Pasco, and Benton County, Mrs. Storm may only succeed on her illegal search and excessive force claims if she has properly asserted a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because counties and

municipalities cannot be liable under § 1983 on a *respondeat superior* theory. *See Monell*, 436 U.S. at 690-91.  Instead, to succeed on a § 1983 claim against a county or local government entity, a plaintiff must show that their rights were violated as a result of an official government policy or a longstanding practice or custom that constitutes the standard operating procedure of the entity.[5]  *Id.; see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino*, 99 F.3d at 918.  Furthermore, the policy or custom implicated must be the "moving force" behind the injury alleged.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1995).  When a *Monell* claim is predicated on a failure to properly train police officers, the plaintiff must show that the failure to train amounts to "deliberate indifference" to the constitutional rights of people with whom the municipality's officers may come into contact.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 124 (1992); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989).

Here, Mrs. Storm has not presented any direct evidence showing that a municipal policy or custom caused the alleged violations of her

---

[5] Municipalities may also be liable under § 1983 if a violation is committed or subsequently ratified by a municipal official with "final policy-making authority."  *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

ORDER - 12

constitutional rights.  In support of her *Monell* claim, Mrs. Storm argues that the officers conducted a second unconstitutional search on the night of August 25, 2009, when they searched the home of Ms. Lane's mother. Mrs. Storm also points to the fact that a separate and unrelated claim has been filed against the Cities of Pasco, Kennewick, and Richland alleging that police officers forcefully entered a home without authorization.  *See* Armitage Decl., ECF No. [59], Ex. J (complaint for damages in *Travis v. City of Pasco, et al.*, Franklin Cnty. Sup. Ct. Cause No. 11-2-511947).  However, even assuming that the Defendant officers did unconstitutionally search Ms. Lane's mother's home, that fact would not constitute a practice of "sufficient duration, frequency and consistency" to establish a municipal policy or custom.  And the mere fact that another civil litigant has filed a lawsuit against the Municipal Defendants and their sister city in no way proves that the allegations in that litigant's complaint are true or that, if they were proven, they would demonstrate a municipal policy or custom.  Finally, Mrs. Storm's argument that "the egregious nature of Defendants' conduct could lead a reasonable juror to conclude that officer training is and was inadequate" simply misses the mark because it does not support an inference that the inadequacy of the officers' training amounted to "deliberate indifference" to the constitutional rights of those who the officers came in contact with.

Accordingly, the Court finds that Mrs. Storm has presented no evidence in support of her § 1983 claims against the Municipal Defendants, and grants Defendants' motion in this regard.

/

### b.   Individual Defendants

With regard to the Individual Defendants in this matter, the Court analyzes Mrs. Storm's Fourth Amendment illegal search claim and Fourth Amendment excessive force claims separately.

### I.   Illegal Search Claim

Mrs. Storm's Amended Complaint asserts that the Individual Defendants violated her right to be free from unreasonable searches because the warrant upon which Defendants justified their entry of the Apartment was not based on probable cause.   Defendants respond that the Individual Defendants are entitled to qualified immunity, and argue that the warrant was proper.

### A.   Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   District courts evaluating a claim of qualified immunity must analyze two questions: one, whether "the facts alleged show the officer's conduct violated a constitutional right," and two, whether the constitutional right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). District Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[W]hether an official protected by qualified immunity may be held personally liable

for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted).

Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the "clearest indication" that the officers acted in an objectively reasonable manner. *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).   A qualified immunity defense will be lost, however, when "it is obvious that no reasonable competent officer would have concluded that a warrant should issue," for instance if the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Leon*, 468 U.S. at 923).   "[I]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination because it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* (quoting *Leon*, 468 U.S. at 921) (internal quotation omitted).

Here, it is clear that the Individual Defendants who relied on the search warrant obtained by Officer Lee acted in an objectively reasonable manner.   The search warrant, ECF No. 44-1 at 1-2, specifies the date, the premises to be searched, and the items to be seized, and the supporting affidavit is not so lacking in indicia of probable cause as to render the

Individual Defendants' reliance upon it unreasonable.  Accordingly, the Court finds that all of the Individual Defendants except Officer Lee are entitled to qualified immunity.

**B.   Probable Cause**

Officer Lee, however, is not entitled to qualified immunity because he provided the affidavit upon which Judge Matheson relied in issuing the warrant, an affidavit that Mrs. Storm alleges was deficient. Specifically, Mrs. Storm alleges that the facts in the warrant were stale, that Officer Lee omitted material facts from the affidavit, and that the affidavit lacks any facts to demonstrate that the information provided by Steven Semmern was reliable.  Accordingly, the Court evaluates whether Officer Lee's affidavit supported the issuance of a warrant.

"Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Millender v. Cnty. of Los Angeles*, 620 F.3d 1016, 1024 (9th Cir. 2010) (quoting *United States v. Grubbs*, 547 U.S. 90, 95 (2006)).   All information necessary to show probable cause for the issuance of a search warrant must be contained within the "four corners" of an affidavit given under oath. *United States v. Gourde*, 440 F.3d 1065, 1067 (quoting *United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971)).  Courts reviewing the propriety of a warrant are thus limited to the facts submitted in the petitioning officer's affidavit.  *See United States v. Luong*, 470 F.3d 898, 904-905 (9th Cir. 2006) (citing *Gourde*, 440 F.3d at 1067).  "[A] magistrate's determination of probable cause should be paid great

deference by reviewing courts." *United States v. Krupa*, 633 F.3d 1148, 1151 (9th Cir. 2011) (citation omitted).

Mrs. Storm argues that the information in Officer Lee's affidavit was stale because it did not identify when Mr. Semmern picked Fuller up from the apartment. An affidavit supporting a search warrant must be based on facts "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (quoting *Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968)). Courts evaluate staleness "in light of the particular facts of the case and the nature of the criminal activity and property sought," and will not find a warrant to be stale if there is "sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *Id.* at 745-46 (citation omitted). Under this standard, the information in Officer Lee's affidavit was not stale. While the affidavit does not specify exactly when Mr. Semmern picked Fuller up from the Apartment, the affidavit is rife with current, specific information supporting the conclusion that the items to be searched were at the Apartment: Fuller was believed to have robbed two banks wearing the specified clothing just seven days earlier; Fuller was believed to have robbed the Rite Aid with the specified explosive device *that morning*; and Mr. Torres' statement just minutes before Officer Lee's testimony supports the inference that a person intent on avoiding detection was still in the Apartment.[6] These recent facts, coupled with

---

[6] Mr. Torres' twin statements that no one else was in the Apartment and that he did not move the curtain are contradictory, such that one

the fact that the white pickup truck Fuller had used as a getaway vehicle just ten days before was parked outside of the Apartment, support a reasonable belief that Fuller was in the Apartment with the items specified in the search warrant.  Officer Lee's affidavit was not stale.

Mrs. Storm also argues that the warrant was defective because Officer Lee omitted material facts in his affidavit, namely, the facts that 1) Ms. Lane told Officer Gregory no one was in the Apartment and 2) a cell phone "ping" placed Fuller in a different location.  A search warrant is invalid if the underlying affidavit "contained misrepresentations or omissions material to the finding of probable cause," and the plaintiff makes a "substantial showing that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth."  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1223-24 (9th Cir. 2009)) (internal quotation omitted).

Here, the facts omitted by Officer Lee were neither material to the search warrant nor omitted intentionally or with reckless disregard for the truth.  It is unclear whether Officer Lee was even aware of Ms. Lane's call at the time that he called Judge Matheson, but even if he were, the fact that Ms. Lane had lied about whether Mr. Torres was in the

---

must be false: either Torres was alone in the Apartment and moved the curtain, or he did not move the curtain and someone else did.  The fact that Torres would lie with no apparent personal motive supports the reasonable inference that he was attempting to protect someone inside the Apartment.

ORDER - 18

apartment just moments before renders her statement so unreliable as to be immaterial. And the Court rejects out of hand Mrs. Storm's argument that the cell phone ping "placed" Fuller in *any* particular place; the precision of network-based cellular phone location data depends on a number of factors including the density of cell towers in the related area, and the technique has an apparent maximum accuracy of 100 to 300 meters. *See In re: App. of the United States for an Order for Prospec. Cell Site Location Info. on a Certain Cellular Tel.*, 460 F.Supp.2d 448, 451 n. 3 (S.D. N.Y. 2006) (discussing network-based "triangulation" of cellular phones); *see also* Michael Cherry, et al., *Cell Tower Junk Science*, 95 JUDICATURE 151 (Jan.-Feb. 2012) (criticizing use of network-based cellular location data in criminal prosecutions). Because the fact that the ping "placed" Fuller roughly four blocks from the Apartment at best only indicated that Fuller was in the vicinity, the Court finds that this fact was immaterial to the issue of probable cause; if anything, the ping actually *supported* the officers' inference that Fuller was in the Apartment. Furthermore, even if either of the two above-mentioned facts were material to the issue of probable cause, Mrs. Storm has presented no evidence tending to demonstrate that Officer Lee's omissions were made intentionally or in reckless disregard of the truth. Rather, in light of the fact that Officer Lee made his affidavit in the midst of an assembling SWAT team outside of an apartment complex where a man was believed to be hiding out with a bomb, it is entirely reasonable to conclude that Officer Lee's omissions were inadvertent. Accordingly, the Court rejects Mrs. Storm's argument that the warrant was invalid because Officer Lee omitted material facts in his affidavit.

ORDER - 19

Finally, Mrs. Storm argues that the affidavit is lacking because it did not include information regarding Mr. Semmern's reliability. When considering whether an informant's tip is sufficient to support a finding of probable cause, federal courts employ a "'totality-of-the-circumstances approach' that takes into consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge.'" *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Courts generally consider four factors in determining the reliability of an informant's tip: whether the informant is known or anonymous, whether the informant has a "proven track record of reliability," whether the informant reveals the basis of his knowledge, and whether the tip provides "detailed predictive information about future events that is corroborated by police observation." *Id.* (citation omitted). Here, the Court finds that Officer Lee's discussion of the information provided by Mr. Semmern was sufficiently reliable under the totality of the circumstances. Mr. Semmern provided his name with no request for anonymity, meaning that his "reputation [could] be assessed and [he could] be held responsible if [his] allegations turned out to be fabricated." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)). Additionally, the affidavit describes how Mr. Semmern's information regarding both the number of the apartment and Ms. Lane's name was corroborated by the ILEADS database. Finally, based on the mere fact that Fuller's getaway vehicle was parked in front of the Apartment, the warrant would be sufficient to support a finding of probable cause even without the information provided by Mr. Semmern. Accordingly, the Court rejects Mrs.

Storm's argument that the warrant did not contain sufficient information to detail Mr. Semmern's reliability.

For the reasons discussed above, the Court finds that Officer Lee's affidavit was sufficient to establish probable cause for the warrant to issue, and grants Defendants' motion with regard to Officer Lee as well.

## II.  **Excessive Force Claim**

Mrs. Storm's excessive force claim is analyzed under the Fourth Amendment's prohibition of unreasonable searches and seizures.  Whether the Individual Defendants used excessive force in searching the Apartment depends on "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  This inquiry requires balancing the nature and quality of the intrusion on an individuals' Fourth Amendment interests against the countervailing governmental interests at stake. *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007) (quoting *Graham*, 490 U.S. at 396).  Courts in the Ninth Circuit analyze the government's interest in the use of force by evaluating three non-exclusive factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396).

Here, the Individual Defendants' use of force was clearly reasonable under the totality of the circumstances.  First, while the intrusion on Mrs. Storm's Fourth Amendment interests was substantial and caused her to incur significant repair costs, it was an intrusion on a property

interest that did not involve bodily injury or an otherwise wrongful intrusion on an individual's liberty interest.  On the other side of the scale, the government's interest in the use of force during the search warrant's execution was enormous.  Fuller was reasonably believed to be in possession of an explosive device, posing a serious and immediate threat to the safety of the SWAT team as well as the residents of the neighborhood who had gathered in the vicinity, *see* Roske Decl., ECF No. 47 ¶ 31, which is the "most important factor under *Graham*." *Bryan*, 630 F.3d at 826 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)).  Fuller was also being investigated for the serious crime of armed robbery, and under the officers' reasonable belief that Fuller was in the apartment, his non-responsivness to the officers' public address announcements indicated he was attempting to evade arrest. Finally, Officers Dubois and Law credibly state in their declarations that it was necessary for the SWAT team to use flashbangs, chemical agents, and Stingers to disorient or disable Fuller in order to safely enter the Apartment, assertions which Mrs. Storm has not disputed.  *See* Dubois Decl., ECF No. 45 ¶ 7; Law Decl., ECF No. 48 ¶¶ 22-24. Accordingly, the Court finds that the Individual Defendants' use of force in executing the search warrant was not excessive, grants Defendants' motion in this regard, and denies Mrs. Storm's motion.

### ii.  State Law Claims

Mrs. Storm has also asserted claims for illegal search and excessive force under Article I § 7 of the Washington Constitution, common-law trespass and negligence claims, and a claim for wrongful damage to property under RCW 4.24.630. As stated on the record, the Court's ruling

on these motions is largely foreclosed by the discussion above.  In the interest of clarity, the Court briefly recites the justifications for its rulings below.

Mrs. Storm's trespass claim fails because the officers were under "a duty or authority imposed or created by legislative enactment[, which] carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority. . ." *Peters v. Vinatieri*, 102 Wn. App. 641, 655 (2000) (quoting Restatement (Second) of Torts § 211 (1965)).  Here, the officers were acting within the authority granted them by virtue of their positions, and Mrs. Storm's trespass claim thus fails as a matter of law.

Mrs. Storm's negligence claim fails because under the "public duty doctrine," "no liability will attach for a public official's negligent conduct unless the plaintiff can show that the duty was owed to her rather than to the general public." *Donaldson v. City of Seattle*, 65 Wn. App. 661, 666 (1992) (citing *Taylor v. Stevens Cnty.*, 111 Wn.2d 159, 163 (1988)).  Here, because the officers were acting out of their duty to the public as a whole, Mrs. Storm's negligence claim fails as a matter of law.

Mrs. Storm's wrongful damage to property claim fails because the officers did not act "wrongfully," that is, they did not "intentionally and unreasonably commit[] the act or acts while knowing, or having reason to know, that he or she lack[ed] authorization to so act." RCW 4.24.630.  Rather, as discussed above, the officers were justifiably relying upon a valid search warrant, and thus no liability attaches under RCW 4.24.630.

Finally, while Washington's Fourth Amendment analogue in some areas provides greater protections than the federal constitution, Mrs. Storm's state constitutional claim fails under the state's more-stringent *Aguilar-Spinelli* test for informant reliability because, as discussed above, Officer Lee's affidavit would have established probable cause even without the information provided by Mr. Semmern.

For these reasons, as well as those stated on the record, the Court grants Defendants' motion with regard to each of Mrs. Storm's remaining state law claims.

**III. Conclusion**

For the reasons discussed above and at the hearing, **IT IS HEREBY ORDERED:**

1.  Mrs. Storm's Cross Motion for Partial Summary Judgment on Probable Cause, **ECF No. 55**, is **DENIED**.

2.  Defendants' Motion for Summary Judgment, **ECF No. 40**, is **GRANTED**.

3.  All pending hearing and trial dates are **STRICKEN**.

4.  Judgment shall be **ENTERED** in Defendants' favor with prejudice and this file shall be **CLOSED**.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide copies to counsel.

**DATED** this _____14th_____ day of August 2012.


_____
S/ Edward F. Shea
EDWARD F. SHEA
Senior United States District Judge


Q:\EFS\Civil\2010\5093.MSJ.lc2.wpd


ORDER - 24